EXHIBIT 1

## Introduction:

What follows is a competitive analysis of the product, packaging, positioning and merchandising presentations for the *Only Hearts Pets* (OHC). I applied the following four (4) questions to each of the eleven (11) "elements of consideration". The response to each question relative to each "element" is keyed as follows:

#1 – Does this element serve any purpose other than an aesthetic purpose?

#2 – Have you seen this element in other product lines directed at the same general market?

#3 – Is this element unique or novel to the Only Hearts Pets line?

#4 – Are there other product lines that have incorporated some or all of these elements other than Only Hearts Pets?

## Elements of Consideration:

- **Total image and overall appearance of doll and packaging:**
  #1. – The product's Design is driven by aesthetics with the exception of the elongated arms and Velcro joinery. In addition to the brand aesthetic, the packaging is driven by functionality needs, as well. (e.g. in-store merchandising solution for small item, messenger/canvas for sales copy, product positioning (naming each character, branding message for OHC, etc.)
  #2. Yes. The design/visual personalities of each of the characters are fairly generic and driven by species'-specific attributes. The use of the open-tray with a backer-card header is very standard within the overall plush category and the micro/mini plush sub-set in particular.
  #3. – Not really. While the character designs may have been produced specifically for OHC, their features aren't unique or distinguishable. The alternate placement of the Velcro joinery on the inside and outside of the paws may offer a unique product attribute – while I'm familiar with the use of Velcro as a joinery on plush, I'm not aware of this particular placement of the Velcro by other competitors.
  #4. – Yes. I've articulated some examples in my responses below.

- **Small Size:**
  #1. - Yes, the micro/mini size of the OHC products promotes collectability and portability of the product. Also, the small size is an inherent attribute in the multiple ways a child can interact with the product (e.g. pencil pals, back-pack charms, zipper-pulls, etc.)
  #2. - Yes. The micro/mini size (3 -5" dolls/plush) trend has remained an important driver to the doll, plush and collectable product categories since it first started gaining steam in the early 2000's.

#3. - No. Small-format animal plush is too pervasive in the global marketplace for this to be a novel/unique format or product attribute to OHC.

#4. - Yes – many toy /plush marketers have introduced a micro/mini product line in recent years (e.g. Mattel – Furryville / Manhattan Toy – GG Goovin' Pets / Hasbro – Littlest Pet Shop, International Playthings – Calico Critters / Ugly Dolls minis / Wild Republic Mini Clip Pets, Mini Pets – Oriental Trading, etc.)

- **Shape:**
  #1. - No. As far as I can tell, the shape of OHC is entirely a design-driven aesthetic.
  #2. – Yes. I don't see anything relative to the shape of the OHC line that is proprietary.
  #3. – No. The shape of the line is more a function of the species attributes of the animal vs. a unique/novel shape.
  #4. – Yes. Once again, the shape of the OHC products is very common in the marketplace.

- **Body Proportions:**
  #1. – Potentially. I believe the slightly elongated arms are designed to facilitate the "necklace/bracelet" chain-building feature of the product – as well as for the ability to attach (wrap or hug) the characters to other products (e.g. pencils, etc.)
  #2. – Yes. Many plush marketers use elongated arms as a design and/or functional element (e.g. Sliders by Animal Adventure, Aurora Hugging Plush Animals, etc.).
  #3. – No. as an example, the mini "hugging" Koala Bears from years past had elongated arms as a defining attribute.
  #4. – Yes.

- **Posture:**
  #1. – No, in my opinion, the posture of OHC is purely a design aesthetic.
  #2. – Yes. The OHC products share a generic posture that is very common in plush products.
  #3. – No. Nothing is remotely recognizably unique/novel relative to the OHC posture. The majority of plush animals (in any size) share a "seated" posture similar to the OHC products.
  #4. – Yes. The sitting posture of the OHC animals represents one of the most widely utilized designs in plush. Intuitively, the "seated" posture is how customers interact with and display their plush purchases.

- **Juxtaposition of features:**
  #1. – Yes, if what is meant by the "juxtaposition of features" relates to the placement of the Velcro pads on the inside of one "paw" and the backside of the other "paw". Other than this feature, I'm not able to identify any juxtaposition of features that go beyond

aesthetic (or otherwise) and don't believe a consumer could readily articulate any of these features, as well.

#2. – I don't see the "jux of features" in the OHC line – but, I have observed it in other products where the animals take on "human-oid features, characteristics and/or personas.

#3. – No.

#4. – Yes. There are numerous mini-plush / plush product lines that use "jux of features" positioning (e.g. Furryville, Calico Critters, Paw-Parazzi, Groovy PetRagious, etc.)

- Stitching:
  #1. – No. The stitching/embroidery of the facial features are entirely a design aesthetic.
  #2. – The stitching/embroidery used on and the placement of them on the OHC products (e.g. eyes, noses, mouths, etc.) are generic and appear very similar to many other plush products in the marketplace.
  #3. – No. I can't isolate anything in the stitching to be novel, unique or proprietary in application and/or function.
  #4. – Yes. The use of stitching/embroidery to create facial features is a very common and cost effective manufacturing process in the production of plush characters. With increased safety concerns/testing requirements enacted with the CPSIA of 2008 stitching facial features has become an even more common and effective alternative to sewn-on dimensional eyes, noses, etc. which can come apart to create a choking hazard.

- Hands clasped with Velcro:
  #1. – Yes. They are a functional design to allow for the OHC products to attach to other items (e.g. pencils, fingers, etc.) as well as connect to other OHC characters to create chain necklaces, bracelets, etc.) The included plastic clip allows the OHC products to attach to backpacks, key rings, zipper-pulls, etc.)
  #2. – Yes. The use of Velcro as a joinery for plush is a fairly common feature with functional plush products.
  #3. – No. I don't find how the Velcro is being used on the OHC products to be unique. However, the design application of the Velcro (on the inside of the paw on one side /on the outside of the paw on the other side) may be novel / unique.
  #4. – Yes. Velcro as a joinery material has been a popular material element in the design/manufacturing of functional plush. (e.g. Best-made Toys – wrap-arounds monkeys with Velcro hands / Aurora Plush "hugging animals" with Velcro hands / Noveltees - : hang-arounds animals with Velcro hands, Purr-fection "hugger plush" with Velcro hands, etc.) Additionally, due to the increased testing/safety requirements associated with the 2008 CPSIA legislation, many plush manufacturers have replaced the use of magnets with Velcro as their joinery element.

- Positioning of a small pink heart on the side of each pet's buttocks:

  #1. – Yes. The use of an embroidered pink heart logo functions to promote the collectability of the OHC products as well as to re-enforce the "authenticity" of the product.

  #2. – Yes. Many marketers of plush products use an embroidered design element or special tag to build brand-loyalty and help fuel the collectability for these products. (e.g. Groovy Girls PetRagious animals feature an embroidered Groovy Girls "flower" logo on a front paw of each animal; GG Horses feature an embroidered "flower" logo on their buttocks. TY uses its red heart logo tag to promote the collectability of beanie babies, Steiff uses a red ribbon ear application to distinguish its plush, Sigikids uses embroidered logos on most of its plush products, etc.)

  #3. – While the Pink Heart embroidered logo could be considered "unique or novel" to OHC inasmuch as a pink heart is a primary element of the OHC logo / design mark, using an embroidered design/logo on plush body parts to promote collectability/authenticity isn't a unique/novel strategy. Furthermore, inasmuch as the placement of the pink heart embroidery appears on the pet's buttocks, it's not visible to the customer until after he/she removes the product from the packaging.

  #4. – Yes. As noted above.

- Manner in which the pets are posed sitting up on their backsides, upright in their packaging, facing the consumer:

  #1. – Yes. Aesthetics is a fundamental driver for any packaging and/or merchandising presentation – including the OHC product presentation. Intuitively, this poised position is how consumers interact with plush products both in-store and at-home. Additionally, having the animals sitting up in an open tray with backer-card is an efficient merchandising strategy to help keep the in-store presentation of the product looking organized, clean and easy-to-shop.

  #2. – Yes. The vast majority of plush items that are merchandised in an open tray like the OHC products are poised in the same "sitting-up"/ facing the consumer" position. There simply aren't many other (if any) effective alternatives.

  #3. – No. How the OHC products are poised / positioned is a "standard industry practice" utilized globally. In my opinion, there is nothing unique with how the OHC products are poised/packaged.

  #4. – Yes. Most all plush manufacturers worldwide utilize this poise/packaging solution for their "boxed" product presentations.

- Use of Tiered Stadium Display:

  #1. Yes. The tiered display serves a functional purpose, as well. It helps keep the product presentation looking clean and organized at retail – also, a self-contained display/shipper is an efficient way for retailers (especially mass channel) to manage orders and restock inventory levels.

#2. – Yes. Most micro/mini products require a form of the Tiered display/shipper for a retail to carry the product (especially in the mass / national channel).

#3. – While the specific dimensions, graphic presentation of the OHC tiered stadium display may be unique, the concept of this display format is not novel or proprietary. This style of display/shipper for small/impulse purchase toy items is widely used throughout all channels of the retail landscape.

#4. – Yes. Groovy Girls Groovin' Pets, Dr. Seuss mini plush Horton for the Horton Hears a Who movie promotion, Calico Critters, etc. use tiered display/shippers that are similar to the OHC display presentation.

Dated: March 17, 2010                          By: _____
                                                        Hugh J. Kennedy

# EXHIBIT 2

1 | SEDGWICK, DETERT, MORAN & ARNOLD LLP
ROBERT F. HELFING  Bar No. 90418
2 | robert.helfing@sdma.com
HEATHER L. MCCLOSKEY   Bar No. 193239
3 | heather.mccloskey@sdma.com
CAROLINE Y. BUSSIN   Bar No. 239343
4 | caroline.bussin@sdma.com
801 South Figueroa Street, 19th Floor
5 | Los Angeles, California 90017-5556
Telephone: (213) 426-6900
6 | Facsimile: (213) 426-6921

7 | Attorneys for Defendant BLIP, LLC

8

9 | UNITED STATES DISTRICT COURT

10 | CENTRAL DISTRICT OF CALIFORNIA

11 | OHC GROUP LLC, a Delaware
limited liability company,
12 |                                              CASE NO. CV09-5804 PA (FFMx)

13 |                 Plaintiff,           **DEFENDANT BLIP, LLC'S RULE
26 REBUTTAL EXPERT
DESIGNATION FOR HUGH
14 |        v.                            KENNEDY**

15 | BLIP, LLC, a Minnesota limited
liability company,
16 |                 Defendant.

17

18 |        Pursuant to Federal Rule of Civil Procedure 26, defendant Blip, LLC

19 | ("Blip") hereby designates the following witness who may be used as a rebuttal

20 | expert witness:

21 |        1.      Hugh J. Kennedy; 2720 Chadwell Circle, Wayzata, MN 55391; (952)

22 | 334-6782.

23 |        2.      Mr. Kennedy's rebuttal report concerning his opinions is attached

24 | hereto as Exhibit "A."

25 |        3.      Mr. Kennedy's curriculum vitae was previously attached as Exhibit

26 | "C" to Blip's opening expert designation.  Mr. Kennedy has not authored any

27 | publications in the previous ten years, or testified as an expert at trial or by

28 | deposition within the previous four years.

LA/944019v1

1

1     4.     Mr. Kennedy's rate of compensation to be paid for his study and

2 testimony in this case is $300/hour.

3     Blip reserves the right to amend or supplement this disclosure pursuant to

4 Federal Rule of Civil Procedure 26(e).

5

6 Dated: April 7, 2010          SEDGWICK, DETERT, MORAN & ARNOLD LLP

7

8                   By: _____

9                      Robert F. Helfing

10                    Heather L. McCloskey
                       Caroline Y. Bussin

11                    Attorneys for Defendant BLIP, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Rebuttal of OHC Expert Witness Reports by Hugh J. Kennedy

**Case Name:** *OHC Group, LLC v. Blip, LLC*
**Submitted:** April 7, 2010

## SUMMARY OF REBUTTLE OPINIONS

1. I strongly disagree with the opinions of David Okada and Nancy Zwiers relative to their position that the Only Hearts Pets and their packaging represent a *new and distinctive approach to plush toy animals and acts as a source or brand identifier*. With the exception of the Only Hearts Pets branding, there is little – if anything relative to the overall look and feel that is decidedly unique, innovative or proprietary to the product, packaging or merchandising of Only Hearts Pets miniature plush animals to distinguish the line from many other competitive plush toy collections that appeal to a similar consumer segment. The product concept, design and presentation for the line are neither a new nor novel idea.

2. While certain similar elements may exist in each of the two product lines, (Only Hearts Pets and Whimzy Pets) it's my observation that the similar elements are those that, per my instruction on the law by Blip's attorneys – are not protected by copyright and trademark law.

3. The overall look and feel of the actual products of each of the two lines is primarily driven by, and is an inherent function of,  the *true-to-the-species* approach of an animal-focused plush line (e.g. -  a Panda always has black and white color blockings in specific areas of its anatomy, a bunny has long floppy ears, etc.). I'm not able to distinguish any meaningful *original* design elements used by Only Hearts Pets in their product designs to support Ms. Zwier's and Mr. Okada's contention that the OHC Pets trade dress is strong and distinctive – that is to say: which is decidedly unique to Only Hearts Pets.

A. **ANALYSIS REBUTTAL**

I disagree with the criteria/rationale identified by the OHC expert witnesses as referenced below to support their position that the "Only Hearts Pets Mini-Plush Pets Line has a distinctive Overall Look and Feel" for the following reasons:

1. **"The placement of each individual pet in an open box packaging, given the small size".**

As the mini plush product trend grew over the last decade, retailers (especially in the mass channel) increasingly began to require manufacturers of mini plush to provide a packaging solution to help combat shrinkage and to provide for a clean merchandising solution for the mini format that helps break-thru the clutter that is inherent within the large continuous POG display environments of the mass channel. Plush has always been a tactile product – it's important that the consumer can touch & feel the plush fabrics. The "open tray with backer" packaging solution used by both OHC Pets and Whimzy Pets is an effective and commonly used packaging solution by numerous plush marketers for a variety of sizes of plush animals (SEE EXHIBIT A)

2. **"The use of a tiered stadium with a cut out shape containing the OHC logo on the bottom front to display the Only Hearts Pets".**

Similarly to why a packaging solution as mentioned above is important for mini plush product lines, so is the need for an in-store display/shipper. The disposable, corrugated tiered display serves a very functional purpose and is increasingly a requirement for mass channel retailers to agree to carry any mini plush product line(s). The self-contained display/shipper allows for a mini plush line to be effectively displayed and more easily "shopped" by consumers on a 24' in-line POG that is the norm in the mass channel. The tiered stadium design provides a functional solution for more easy viewing / access to the products by the consumer – particularly as the POG shelves where the tiered display is placed widen (get deeper) as they progress or waterfall to the floor of the POG. Additionally, the pre-packed display/shipper provides the retailer an easy way to manage inventory levels/reorders and restocking – simply dispose of the

empty display with a new pre-packed display. Because of these in-store retailer requirements, the tiered stadium display construction continues to be a pervasive merchandise format/ functional solution used by many marketers in the mini plush and impulse purchase product segments and is not unique or distinctive to the OHC Pets, specifically. In addition, inasmuch as the tiered stadium display is just one of a number of other display/merchandising solutions offered to retailers by OHC in its sales collateral materials, the tiered display cannot be viewed as a defining attribute of the OHC Pets positioning. (SEE EXHIBIT B)

3. **"The positioning {posture} of a variety of pets sitting upright, with their faces tilted upwards, looking the consumer in the eye".**

Plush products represent an "emotional purchase" – many plush marketers leverage this effective emotional connection/attribute by designing plush animals in a seated posture and having "eye contact" with the consumer. This pattern design / positioning has become an industry-standard practice and used globally across many plush formats and sizes. There is nothing either unique or proprietary about the posture/positioning of the OHC pets line. (SEE EXHIBIT C)

4. **"The miniature size of the pets".**

The mini animal plush product segment has been a growing and enduring trend since the early days of the new millennium. Mini / Small-format plush – especially animals – is far too pervasive in the global marketplace for the miniature size to be considered a novel/unique format or distinguishing attribute to OHC Pets as the OHC expert witnesses suggest. Examples of plush marketers who have introduced mini animal plush lines in addition to OHC Pets and Whimzy Pets include: (1) Manhattan Toy – *Groovy Girls Groovin' Mini Pets* (2) Oriental Trading Company *Mini Pets collections* (3) Ganz *Lil' Kinz* (4) Wild Republic *Mini Clip Pets* (5) Aurora *Mini Flopsies Animals* (6) Commonwealth *NintendoDogs* (7) Mattel *Furryville*, etc. (SEE EXHIBIT D)

5.  **"The Placement of a small pink heart on the buttocks of each pet".**

Use of an embroidered design element, logo or tag has been used by plush marketers globally for decades to build brand-loyalty, promote collectability and reinforce authenticity. Examples include *Groovy Gils PetRAGIOUS* plush Pet line w/Flower Power design element embroidered on a front left paw of each animal; Russ *Shining Star* plush animals with a star design element on a front paw; Webkinz with a design element embroidered on each animal's paw, TY's red heart tag on its Beanie Babies and Tiny Beanies plush animals, Steiff plush has been authenticated for decades with its red "ear ribbon". More specifically, there have been other plush marketers that have used a "heart" logo on the buttocks' of their plush that preceded the use of the "heart" logo authenticator by OH Pets – namely, the heart logo used on Pound Puppies plush as well as the heart icon used on the buttock of Care Bears plush (SEE EXHIBIT E).  Due to the previous and common use by plush marketers of having an "authenticator" design element on plush, it's difficult for me to understand how OHC's expert witnesses could articulate that incorporating a design element to promote authenticity is a unique/distinguishing element of the OHC Pets line specifically.

6.  **"The wide variety of animals".**

The use of multiple species of plush animals under a single collection is not new, fresh or innovative as suggested by the OHC expert witnesses. Plush marketers have used this approach for more than two decades – most notably by TY with its *Beanie Babies and Tiny Beanies* phenomenon beginning in the late eighties. The Beanie Babies assortments brought together best-loved family pets, farm animals, jungle animals, zoo species, reptiles, marine life, and even fantasy animals like unicorns, dragons, mermaids, etc. marketed under a single collection. Other more recent examples include Russ *Shining Stars* as well as the uber-popular Ganz *Webkinz* animals – featuring animals from all known (and imagined) animal species. Additionally, with Beanie Babies, TY brought the practice of "branding" each animal in its collection with its own distinctive name as a strategy to help the consumer further dimensionalize each plush character – most plush marketers have since followed suit and give each plush animal its own name.

7.  **"The clasping of the pets' paws fasted with Velcro and outstretched in front of the animal".**

The perceived intended use of the Velcro on the paws as a design element to position the OHC Pets as articulated by the expert witnesses isn't consistent with the intended "functional" use of this product attribute as stated in OHC marketing materials for the OHC Pets line. According to OHC's own marketing materials, The Velcro added to the paws serves an entirely *functional* purpose as quoted in the OHC Pet's marketing collateral; ["Their Velcro paws allow them to hold hands to form bracelets, necklaces and barrettes, or to hold on as a backpack, pen or pencil buddy"] vs. the experts witnesses contention that the Velcro paws are ["an extremely important feature for the overall look and attitude of the line – the positioning of the pets"]. Additionally, and perhaps more relevant, a US patent #3,789,547 for the use of a fabric connector [Velcro] on the paws of a plush animal characters and dolls was granted on February 5, 1974 to someone other than OHC. The term of that Patent has expired – making the use of the fabric connectors [Velcro] no longer protectable and in the public domain (SEE EXHIBIT F). At any rate, use of Velcro on the paws of plush as a functional element is neither innovative nor distinctive. (SEE EXHIBIT G)

8.  **"Only Hearts Pets mini-plush pets' trade dress is non-functional".**

I disagree with the assessment of OHC expert witnesses that many of the defining elements of the OHC Pets line are ["cosmetic and arbitrary and accordingly, in my opinion, nonfunctional and protectable"]. In particular, attributes such as the sitting posture of the animals serves a very practical (and functional) purpose

9.  **"Originality – Only Hearts Pets mini-plush pets contain many original elements".**

Based upon my experience in the plush toy industry, it's my opinion that the OHC Pets line has few original elements/attributes that could be characterized as original, innovative or unique – including:

- **The posture of the pets** – having animals seated and looking directly at the consumer is a widely used product/pattern design in all sizes and formats in the plush category.
- **The positioning of the Pets in their packaging** – An open-tray with backer card packaging solution has been used for many years within the plush category – particularly in the big box / mass channel retail environment.
- **The dimension/body proportions of the pets** – inasmuch as the OHC Pets feature a species-specific design approach, there is nothing particularly unique or original about their proportions/dimensions which are mainly driven by the true-to-the-species integrity used by OHC Pets. Additionally, OHC color palettes are consistent with the true-to-species positioning. Additionally, I'm thoughtful that while both the OHC Pets and Whimzy Pets lines share many of the same species types, the design/pattern executions of each of these shared species is noticeably different – often in color palette and form (SEE EXHIBIT H).
- **The wide variety of pets in the display** – the multiple species approach used by OHC Pets has been used by numerous other plush marketers over the previous few decades; including TY Beanie Babies, Russ Shinning Star animals, and WebKinz interactive plush animals, to name a few widely distributed examples. This display approach is neither original, innovative nor unique to the OHC program
- **The use of an embroidered design element / authenticator on the buttocks of the pets** – As previously stated, many major plush marketers have used an embroidered design element or tagging to distinguish their plush products and promote collectability. While the actual small pink heart itself may be unique in the plush category to the OHC Pets, the strategy to use this type of design elements/emblem on plush is not original, innovative nor unique.

Importantly, the OHC Pets line was launched as a line extension to the popular Only Hearts Club doll line that was originally introduced in approximately 2005. Much of the trade dress (e.g. logo treatment, color palette, type fonts, visual positioning, etc.) for the OHC Pets is decidedly similar to the Only Hearts Club Doll brand print. In my opinion, I believe this was a deliberate strategy to direct the consumer to make a connection between the two OHC product lines. So, much of the brand DNA for the OHC Pets line is a descendent of the Only Hearts Club Doll line.

## B.  CONCLUSION

I am not a lawyer or an expert in trademark or copyright law, nor have I had any formal training in the law. Blip's attorneys have advised me that elements common to other products in the plush category and/or toy industry and utilitarian features of products are not protected by trademark or copyright law. I agree to some extent with Nancy Zwiers and David Okada that there are certain similar elements in the two lines of product (Only Hearts Pets and Whimzy Pets). However, the similar elements are those that, per my instruction on the law by Blip's attorneys, are not protected by copyright and trademark law.

Hugh J. Kennedy

APRIL 7, 2010
Date

# EXHIBIT "A"

## Competitive Examples of Open Tray Packaging Solution

**Figure A.1**



**Figure A.2**



**Figure A.3**



**Figure A.4**

**Figure A.5**



# EXHIBIT "A" (cont'd)

## Competitive Examples of Open Tray Packaging Solution

**Figure A.6**

**Figure A.7**





**Figure A.8**



## EXHIBIT "B"

## Competitive Examples of Tiered Stadium Display

**Figure B.1 Groovin' Pets**

**Figure B.2 Nintendogs**




**Figure B.3 Tiny Tag-alongs**



# EXHIBIT "C"

## Competitve Examples of Seated Plush Animals Making Eye Contact With Consumers



Figure C.1    Figure C.2    Figure C.3

Figure C.4    Figure C.5    Figure C.6

Figure C.7    Figure C.8    Figure C.9

## EXHIBIT "D"

### Competitive Examples of Other Mini Plush Lines

**Figure D.1 Happy House**

**Figure D.2 Nintendogs**





**Figure D.3 Groovy Girls Groovin' Pets**

**Figure D.4 Ganz Lil' Kinz Mini Plush**





**Figure D. 5 Oriental Trading Company Mini Plush**



# EXHIBIT "E"

## Competitive Examples of Plush Animals with Heart on Buttock

**Figure E.1 Care Bear**



**Figure E.2 Pound Puppy**



**Figure E.3 Only Hearts Pet**



**EXHIBIT "F"**

**Copy of Expired Patent No. 3,789,547**

**for Use of Fabric Connector [Velcro] on Paws of Plush Animal**

**(See Following Pages)**

# United States Patent [19]

Chemarin

[11] **3,789,547**

[45] Feb. 5, 1974

[54] MANUFACTURING PROCESS FOR DOLLS, PUPPETS, PLUSH ANIMALS, CONSISTING IN THE USE OF TWO FABRICS ADHERENT ONE TO THE OTHER

[76] Inventor: Maurice Roger Francois Chemarin, 83, Rue de Maubeuge, Paris, France

[22] Filed: Mar. 16, 1972

[21] Appl. No.: 235,428

### Related U.S. Application Data

[63] Continuation of Ser. No. 883,878, Dec. 10, 1969, abandoned.

[52] U.S. Cl. .................................... 46/158, 46/151
[51] Int. Cl. ........................................ A63h 3/02
[58] Field of Search. 46/151, 158, DIG. 1, 156, 162

[56] References Cited
UNITED STATES PATENTS

| | | | |
|---|---|---|---|
| 1,336,898 | 4/1920 | Flynn | 46/151 |
| 3,316,669 | 5/1967 | Nachbar | 46/157 |
| 3,370,853 | 2/1968 | Feld et al. | 46/DIG. 1 |

FOREIGN PATENTS OR APPLICATIONS

| | | | |
|---|---|---|---|
| 583,408 | 12/1946 | Great Britain | 46/151 |
| 409,838 | 5/1934 | Great Britain | 46/DIG. 1 |

*Primary Examiner*—F. Barry Shay
*Attorney, Agent, or Firm*—Nims, Howes, Collison & Isner

[57]                    **ABSTRACT**

Improved construction for children's toys such as dolls, animals and the like incorporating selectively located gripping areas on the surface of displaceable body elements thereof that are releasably engageable with grip receptor surfaces on the body portion thereof to permit selective body element displacement and releasable maintenance of displaced positioning thereof.

**3 Claims, 9 Drawing Figures**



Patented  Feb. 5, 1974                    3,789,547



FIG.3

FIG.2

FIG.1

FIG.5

FIG.6

FIG.4

FIG.8

FIG.9

FIG./

INVENTOR.
Maurice Roger Francois Chauvin
BY

3,789,547

1

## MANUFACTURING PROCESS FOR DOLLS, PUPPETS, PLUSH ANIMALS, CONSISTING IN THE USE OF TWO FABRICS ADHERENT ONE TO THE OTHER

This is a continuation of copending U.S. Application Ser. No. 883,878, filed Dec. 10, 1969, now abandoned.

One is acquainted with the traditional manufacture of dolls, puppets or plush animals; in order to give them an appearance of life or to modify their postures (for example to make them raise and lower their arms, or sit) one must provide either a system of ball-and-socket joints, washer joints or the like, or a metal framework bracing the interior of the body and of the limbs in some way, assuming, through deformation, the desired posture and, by doing this, to give it a little animation, more especially as far as the arms are concerned. As for the paws or the legs, there is the fact that one can put the toy into a sitting position, but it is still necessary (in the case of a deformable joint, that is to say comprising an internal framework) to manage to bend the paws or legs well at a right angle in order to obtain a satisfactory sitting position.

The operation of these internal joints is, all the same, rather difficult for relatively young children, lacking a little of the strength necessary to bend the framework, and especially of the 'sense of balance which is indispensable in order to succeed in making the toy bide in practice and at once.

The operation of ball-and-socket joints or disc joints is easier, but it has a result limited to the single movement from bottom to top or top to bottom, without lateral diversion. Moreover, in the long run, the play assisting, they end up by becoming slack and no longer bide, as it were, and the raised arm drops down; the sitting bear or baby doll falls over on its back or falls forwards.

Besides, none of those traditional joints give sufficient prehensile strength to the arm to allow them to hold an object, for example; a feeding bottle, a small box, a rattle, a spoon, etc.---, as children like to have their toy do. This is due, in the first place, to the fact that the extremities of the paws or arms do not remain united.

In the same way, the balance in the sitting position would be greatly facilitated if the end of the arms and the end of the paws (or the hands and the end of the feet in the case of small figures having a human appearance) were connected together in the way, moreover, in which a baby holds itself. This is where the proposed method comes in.

It is based upon the utilization of the closure system, very well-known in other respects, composed of two fabrics and based upon the principle of the fastening strength of hundreds of small hooks woven into a fabric and bedding themselves into another fabric, a very supple fabric in the style of "astrakhan" or "knop wools."

A simple pressure brings about the introduction of the hooks which dig into the "astrakhan" or "knop" fabric and thus hold the two fabrics firmly.

Contrariwise, an adequate pull extracts the hooks from the "astrakhan" or "knop" and thus frees the two fabrics.

In accordance with the proposed process, one can manufacture an animal, puppet or baby doll in fabric, fur or any other material, and this in a conventional manner.

2

FIG. 1 is a front elevational view of a doll made in accordance with the teachings of the present invention;

FIG. 2 is a magnified view of the right hand palm and fingers or left foot sole and toes;

FIG. 3 is a magnified view of the left hand palm and fingers or right foot sole and toes.

FIG. 4 is an elevational view of the doll illustrated in FIG. 1 with the left and right hands thereof fastened together.

FIG. 5 is an elevational view of the doll illustrated in FIG. 1 in sitting position with the right hand and foot and left hand and foot thereof fastened together.

FIG. 6 is a side elevational view of the doll illustrated in FIG. 5.

FIG. 7 is an elevational view of the doll in a standing position having a second preferred embodiment;

FIG. 8 is an elevational view of the doll illustrated in FIG. 7 in a selected position.

FIG. 9 is an elevational view of the doll illustrated in FIG. 8 in another selected position.

Referring to FIGS. 1, 2 and 3 one fixes to the left limb, for example, the "hook" fabric to which one will have added any shape and colour beneficial to the aesthetics of the toy, a "claw" if it is a question of an animal, a palm or finger if it is a question of a small figure having a human appearance. One fixes, opposite, to the right limb the receiving "astrakhan" or "knop" fabric. The uniting of the two limbs will have the effect of putting the two fabrics in contact, a simple pressure, even very light, and the limbs will remain closely united FIG. 4 by the closure system described. One will equally be able to provide the ends of the lower limbs with the same elements as the upper limbs by arranging them suitably, and the same principle will operate between upper limbs and lower limbs, which will have the effect of giving any desired posture to the toy, which, as a result, will be very easily seated, especially if its balance has been studied in terms of the system used, FIGS. 5 and 6.

Equally, and this is perhaps even more important and even simpler, one will be able to manufacture, in a conventional manner, an animal, doll or puppet, all or part of which will be composed of or covered with a fabric which fulfils the same conditions as the "astrakhan" or "knop" fabric. That is to say, a teaseled fabric of synthetic fibres into which the "hook" fabric (elements of which of adequate shapes will have been arranged at the desired places) will hook itself with the same effectiveness, FIG. 7.

Everything is therefore permitted; from the moment when the claws or the fingers and/or the palms or the soles of the feet have been put into place, and, we recall, solely composed of a "hook" fabric, one can, in terms of their suppleness, make the toys assume all the positions imaginable, since thenceforth the adherence is no longer a function of sole designated or limited places, but is general; that is to say, over all the surfaces of the fabric with which the toy will have been composed or covered, FIGS. 8 and 9.

A toy will therefore be able to be constructed very economically, without having to incorporate therein costly joint systems, since, both esthetically and practically, the proposed method fulfils the same role as the systems known until now, but whilst permitting a simplicity of manufacture and a certain economy in production costs.

3,789,547

3

This system is, moreover, very attractive and even fascinating for the child, who, for hours on end, without difficulty and effort will manipulate his toy, the system of which is in itself a game.

Toys manufactured in accordance with the proposed method are, by that very fact, characterized new industrial products.

What I claim is:

1. A children's toy construction comprising;

a body portion having displaceable body elements extending therefrom,

said extending body elements including hands and feet,

first fastening means of a hooked material secured to said hands and feet and defining thereon first limited fastening areas,

second fastening means of an astrakhan or knop style fabric continuously secured to substantially all of the remaining surfaces of said body portion and body elements and defining thereon second fastening areas of substantially unlimited extent whereby by the bedding of said hooked material into said fabric each of said feet and hands can be secured to said body portion and body elements at an infi-

4

nite number of locations and the noticeability of said second fastening means as a result of the continuous nature thereof is minimized.

2. A children's toy construction comprising a body portion having displaceable arm and legs members extending therefrom,

first fastening means of a hooked material secured to the extremity of at least one of said members and defining thereon a first limited fastening area,

second fastening means of an astrakhan or knop style fabric continuously secured to substantially all of the remaining surfaces of said body portion and arm and leg members and defining thereon a second fastening area of substantially unlimited extent whereby by the bedding of said hooked material into said fabric the extremity of at least said one member can be secured to said body portion and arm and leg members at an infinite number of locations and the noticeability of said second fastening means as a result of the continuous nature thereof will be minimized.

3. A children's toy constructed according to claim 2 wherein said body portion comprises a stuffed fabric.

*   *   *   *   *

5

10

15

20

25

30

35

40

45

50

55

60

65

## EXHIBIT "G"

### Competitive Examples of Plush Animals with Velcro ® Paws

**Figure G.1 Dakin Velcro Koala Bear**



**Figure G.2 Dakin Velcro Teddy Bear**



**Figure G.3 Ty Mischief Monkey**



**Figure G.4 Imprint Items 3.5" Plush Animal w/ Vlecro Paws**



## EXHIBIT "G" (cont'd)

### Competitive Examples of Plush Animals with Velcro ® Paws

**Figure G.5 Indian Gifts Smiley Chimp**

**Figure G.6 Hallmark Velcro Bear**





**Figure G.7 U.S. Toy Co. Wild Animals**



# EXHIBIT "H"

## Comparison of OHC Pets and Whimzy Pets common speicies executions

### Figure H.1



### Figure H.2



# EXHIBIT "H" (cont'd)

## Comparison of OHC Pets and Whimzy Pets common speicies executions

### Figure H.3



### Figure H.4



## PROOF OF SERVICE

OHC Group LLC v. BLIP, LLC - Case No. CV09-5804 PA (FFMx)

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is Sedgwick, Detert, Moran & Arnold LLP, 801 South Figueroa Street, 19th Floor, Los Angeles, California 90017-5556.  On *April 7, 2010*, I served the within document(s):

*DEFENDANT BLIP, LLC's RULE 26 REBUTTAL EXPERT DESIGNATION FOR HUGH KENNEDY*

☐     FACSIMILE - by transmitting via facsimile the document(s) listed above to the fax number(s) set forth on the attached Telecommunications Cover Page(s) on this date before 5:00 p.m.

☒     MAIL - by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

☐     PERSONAL SERVICE - by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☐     OVERNIGHT COURIER - by placing the document(s) listed above in a sealed envelope with shipping prepaid, and depositing in a collection box for next day delivery to the person(s) at the address(es) set forth below via .

Adrian M. Pruetz
Erica J. Pruetz
Lauren M. Gibbs
PRUETZ LAW GROUP LLP
200 N. Sepulveda Blvd., Suite 1525
El Segundo, CA 90245

*Counsel for Plaintiff OHC Group LLC.*

Telephone: (310) 765-7650
Facsimile:  (310) 765-7641
email: ampruetz@pruetzlaw.com
       ejpruetz@preuetzlaw.com
       lmgibbs@pruetzlaw.com

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on April 7, 2010, at Los Angeles, California.

*Patricia Cloutier*

944020